# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| RAWLEIGH PRITCHETT, et al., | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| v. | ) CIVIL ACTION 12-0182-WS-C |
| | ) |
| WERNER ENTERPRISES, INC., | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court on the parties' competing motions for summary judgment. (Docs. 76, 83). The parties have filed briefs and evidentiary materials in support of their respective positions, (Docs. 77-82, 84-88, 94-95, 97, 99), and the motions are ripe for resolution. This order addresses only the threshold issue of whether the plaintiffs are exempt employees; other issues will be addressed in subsequent orders. After careful consideration, the Court concludes that the plaintiffs' motion is due to be granted and the defendant's motion denied.

## BACKGROUND

As set forth in the Court's order denying the defendant's previous motion for summary judgment on the exemption issue, (Doc. 54), the defendant was under contract to provide certain trucking services to a non-party ("Boise") that operates a paper mill in Jackson, Alabama. The twelve plaintiffs are or were employed by the defendant as truck drivers fulfilling this contract. The one-count complaint alleges the plaintiffs were not paid overtime compensation in compliance with the Fair Labor Standards Act ("FLSA").

# DISCUSSION

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"When the *moving* party has the burden of proof at trial, that party must show *affirmatively* the absence of a genuine issue of material fact: it must support its motion with credible evidence ... that would entitle it to a directed verdict if not controverted at trial. [citation omitted] In other words, the moving party must show that, on all the essential elements of its case on which it bears the burden of proof, no reasonable jury could find for the nonmoving party." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1438 (11th Cir. 1991) (en banc) (emphasis in original); *accord Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick*, 2 F.3d at 1116; *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving

party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted); *see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

There is no burden on the Court to identify unreferenced evidence supporting a party's position.[1] Accordingly, the Court limits its review to the exhibits, and to the specific portions of the exhibits, to which the parties have expressly cited. Likewise, "[t]here is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment," *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995), and the Court accordingly limits its review to those arguments the parties have expressly advanced. The Court of course also relies on its order denying the defendant's previous motion for summary judgment and on the evidence cited therein.

**The Motor Carrier Act Exemption.**

The FLSA generally requires payment of time-and-a-half for hours in excess of 40 in a workweek. 29 U.S.C. § 207(a)(1). But "[t]he provisions of

---

[1] Fed. R. Civ. P. 56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record."); *accord Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 672 (10th Cir. 1998) ("The district court has discretion to go beyond the referenced portions of these [summary judgment] materials, but is not required to do so.").

section 207 of this title shall not apply with respect to … any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49 ….." *Id*. § 213(b)(1). This provision is known as "the Motor Carrier Act ["MCA"] exemption." *Abel v. Southern Shuttle Services, Inc*., 631 F.3d 1210, 1211 (11th Cir. 2011). The defendant invokes this exemption, while the plaintiffs assert it does not apply under the circumstances presented.

"We construe FLSA exemptions narrowly against the employer," and "[t]he employer has the burden to show that an exemption applies." *Abel*, 631 F.3d at 1212. Indeed, the employer must establish the exemption "by clear and affirmative evidence." *Gregory v. First Title of America, Inc*., 555 F.3d 1300, 1302 (11th Cir. 2009) (internal quotes omitted). The Court proceeds with these principles in mind.

"There are two requirements for an employee to be subject to the motor carrier exemption." *Walters v. American Coach Lines, Inc*., 575 F.3d 1221, 1227 (11th Cir. 2009). "First, his employer's business must be subject to the Secretary of Transportation's jurisdiction under the MCA." *Id*. "Second, the employee's business-related activities must directly affect the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." *Id*. (internal quotes omitted); *accord* 29 C.F.R. § 782.2(a). The plaintiffs concede that the first element is satisfied. (Doc. 48 at 5).

The following facts concerning the physical layout of Boise's Jackson operation are uncontroverted. It includes three physically separated facilities, consisting of a base mill, a sheeter facility and a warehouse. The base mill site includes two paper machines (J-1 and J-3) and a recycle facility. The sheeter facility site includes the sheeter facility along with a trailer yard and loading docks, where trailers are loaded with product for delivery to customers. Communication among the three facilities is by public road, specifically, Industrial

Parkway. The sheeter facility site is about 2½ miles away from the base mill, with the warehouse another ¼ mile from the sheeter facility. (Doc. 77 at 3; Chancey Deposition at 26, 29-34, 40-44; Davis Deposition at 36-37).

The following facts concerning Boise's production process are uncontroverted. Boise creates paper from pulp on its J-1 and J-3 machines, the paper leaving the machines in the form of "jumbo rolls." The jumbo rolls are so heavy they must be transported to the sheeter facility in 40-foot containers (mounted on removable chassis) specially modified with an additional steel floor and so large that only eight of them can fit on a load. The sheeter facility holds four machines, each of which takes six jumbo rolls at a time and feeds them through the machine, where a rolling knife cuts the paper to the correct size. There are varying sizes into which the machines cut the paper to make copy paper, printing paper, and other types of communication paper. The cut paper is stacked in 500-sheet reams, wrapped, and placed in cartons. The cartons are then stacked on pallets and wrapped. During this process, if Boise determines there is a section of paper that has wrinkles or some defect, "that roll is dumped and not made into paper." Boise considers the steps that occur at the sheeter facility to be "part of the production process for copy paper," and it does not consider the jumbo rolls to constitute finished paper. (Doc. 77 at 3; Chancey Deposition at 31-32, 36-38, 50, 52; Davis Deposition at 131-32).

The defendant considers two forms of movement to constitute transportation of property in interstate commerce for purposes of the MCA exemption: (1) the movement of jumbo rolls from the base mill to the sheeter facility; and (2) the movement, around the sheeter facility grounds and by means of a yard truck, of trailers loaded with outbound paper. (Doc. 77 at 21-24; Doc. 94 at 4-7).[2]

---

[2] In support of its earlier motion for summary judgment, the defendant identified other movements that it claimed to constitute transportation in interstate commerce. The

### A. Jumbo Rolls.

It is uncontroverted that no plaintiff has ever transported Boise paper products outside the state of Alabama. As the parties agree, however, "purely intrastate transportation can constitute part of interstate commerce if it is part of a continuous stream of interstate travel." *Walters*, 575 F.3d at 1229 (internal quotes omitted). "For this to be the case, there must be a practical continuity of movement between the intrastate segment and the overall interstate flow." *Id*. (internal quotes omitted).

The defendant notes that, once they leave the base mill, the jumbo rolls undergo no chemical processing and have no raw materials added. The defendant identifies Boise's product as "paper" and insists that the jumbo rolls constitute paper just as much as the finished reams. (Doc. 77 at 21-22). The defendant dismisses the activity at the sheeter facility as the mere "packaging" of a pre-existing product, and it relies on a policy statement from the Interstate Commerce Commission for the proposition that "repackaging or reconfiguring (secondary packaging) may be performed"[3] without "interrupting the practical continuity of movement in interstate commerce." (*Id*. at 20-21).

The defendant raised the same argument on its previous motion for summary judgment. As the Court noted in its order denying that motion, "[t]he issue addressed by th[is] document[t] is whether and under what circumstances the interstate transportation of property, *once interstate movement has begun*, is cut off by delivery to a warehouse, distribution center or similar facility." (Doc. 54 at 10-11 (emphasis in original)). Specifically, the policy statement addresses whether property that has already crossed state lines continues to move in

---

Court rejected these contentions, (Doc. 54 at 11-15), and the defendant does not re-assert them in the present round of motions.

[3] *Motor Carrier Interstate Transportation – From Out-of-State Through Warehouses to Points in the Same State*, 57 Fed. Reg. 19812 (May 8, 1992).

6

interstate commerce once it comes to rest in a warehouse or similar facility before moving on to another in-state destination. The question here, however, is not whether interstate transport has ended but whether, before the jumbo rolls reach Boise's sheeter facility, it has even begun.[4]

The plaintiffs counter with *Arkadelphia Milling Co. v. St. Louis Southwestern Railway Co.*, 249 U.S. 134 (1919). The Supreme Court there held that the movement of lumber from the woods to a mill, where it was made into staves, headings and hoops, was not movement in interstate commerce because "it was not intended that [the lumber] be transported out of the state, or elsewhere beyond the mill, until it had been subjected to a manufacturing process that materially changed its character, utility, and value." *Id*. at 150-51. The Eighth Circuit, in a case also cited by the plaintiffs, applied *Arkadelphia Milling* to conclude that the transportation of soybeans to a plant that processed them into soybean meal and soybean oil was not movement in interstate commerce because the processing resulted in "the creation of an article of commerce, as distinct from the packing, bailing and the like of an existing one." *Roberts v. Levine*, 921 F.2d 804, 807, 816 (8th Cir. 1990) (internal quotes omitted).

The defendant does not deny that *Arkadelphia Milling* is controlling if it applies. Instead, it attempts to distance this case from that one on the grounds that "the paper put through the sheeter facility is still paper [and] is not transformed into a new article with a new name." (Doc. 94 at 6). But of course a massive "jumbo roll," weighing perhaps a ton or more, is not the same thing as (and does not carry the same name as) a 500-sheet ream of "copy paper," any more than rough lumber is the same thing as a stave, even though both may be called

---

[4] Even if the policy statement addressed the present situation, it states only that "repackaging," also described as "secondary packaging," does not cut off interstate travel. The packaging into reams that occurs at the sheeter facility is not a repackaging but the initial packaging. The same paragraph of the policy statement on which the defendant relies also notes that "processing or substantial product modification of substance" may cut off an existing interstate journey. As discussed in text, that is precisely what occurs at the sheeter facility.

"wood." As the testimony cited above reflects, Boise does not intend to ship jumbo rolls out of state any more than the shipper in *Arkadelphia Milling* intended to send rough lumber out of state. The defendant makes no argument to the contrary.

That the transformation to copy paper materially changes the "character, utility and value" of a jumbo roll is evident. A jumbo roll is not a usable end product but an intermediate product created in the midst of a process designed to produce individual sheets of copy paper. Boise's principal customer is Office Max,[5] a retailer of copy paper and other office products, and the value and utility to it – or to any consumer – of a jumbo roll is dwarfed by the value and utility of the reams of copy paper produced from such a roll.[6] The defendant itself admits as much when it insists that "an actual ream of paper, left packaged, has no function or utility for the customer. In other words, *the utility of the product is derived from actual pieces of paper*, not from the reams of paper." (Doc. 77 at 22 (emphasis added)). Since no "actual pieces of paper" exist until after the jumbo rolls reach the sheeter facility and are cut into individual sheets, the defendant effectively concedes that the plaintiff satisfies the *Arkadelphia Milling* test.

The defendant relies heavily on two cases involving recycled materials. In *Craft v. Ray's, LLC*, 2009 WL 3163148 (S.D. Ind. 2009), the plaintiffs were drivers for a curbside recycling business, who brought bins of recyclables and trash to a central location for sorting and for shredding, compacting or baling in preparation for delivery to interstate purchasers of recyclables. *Id*. at *2. The *Craft* Court ruled that "[t]he recyclables at issue in the instant case were inspected, consolidated, and baled while temporarily stored …. The court believes that these activities fall within the categories of repackaging and reconfiguring, and therefore, do not interrupt the practical continuity of movement in interstate

---

[5] (Chancey Deposition at 38, 106).

[6] As the plaintiffs note, a jumbo roll is useless to someone attempting to use a copier, printer or fax machine.

commerce." *Id*. at *6. *Bilyou v. Dutchess Beer Distributors, Inc*., 300 F.3d 217 (2nd Cir. 2002), involved much the same situation, but the question addressed was not whether sorting, compacting and baling are activities that precede or cut off interstate commerce; instead, the question was whether it mattered that these activities were performed by an entity other than the plaintiff's employer. *Id*. at 224-25. *Craft* and *Bilyou* do not support the defendant's position, because the recyclable materials (glass, aluminum, cardboard and so forth) continued to be those same exact things after being sorted and packaged for shipment. For reasons expressed above, the same cannot be said of the jumbo rolls at issue here.

The defendant also cites *Anheuser-Busch Brewing Association v. United States*, 207 U.S. 556 (1908), for the proposition that "[m]anufacture implies a change, but every change is not manufacture …. [S]omething more is necessary …. There must be transformation; a new and different article must emerge, having a distinctive name, character, or use." *Id*. at 562 (internal quotes omitted). (Doc. 97 at 3). The defendant says *Anheuser-Busch* is relevant because *Roberts* found it so. (Doc. 94 at 5). In fact, the *Roberts* Court said that *Anheuser-Busch* was distinguishable because it was defining "manufacture" as used in a statute, indeed, a statute having nothing to do with the evaluation of interstate commerce. 921 F.2d at 815.[7] But even if *Anheuser-Busch* applied, it would not alter the result here. As discussed above, at the sheeter facility a jumbo roll is transformed into individual sheets of copy paper – an article that did not previously exist, that has a different name, a different character and (because only the individual sheets will fit in a copier, printer or fax machine) a different use.

---

[7] The question in *Anheuser-Busch* was whether corks imported from Spain were thereafter "manufactured" in the United States (by virtue of having undergone certain cleaning and drying processes through which the brewer put them) so as to entitle the brewer to the benefit of a statute permitting an exporter of a domestically manufactured article to receive a drawback roughly equal to the duty paid on imported materials used in the domestic manufacture. 207 U.S. at 559.

9

Finally, the defendant notes that "[a] critical factor in determining the shipment's essential character is the shipper's 'fixed and persisting intent' at the time of the shipment." *Mena v. McArthur Dairy, LLC*, 352 Fed. Appx. 303, 306 (11th Cir. 2009) (quoting 29 C.F.R. § 782.7(b)(2)). (Doc. 77 at 18-19). This intent is to be assessed "from all of the facts and circumstances surrounding the transportation." *Mena*, 352 Fed. Appx. at 306 n.2 (internal quotes omitted). But just as the shipper in *Arkadelphia Milling* had no intent to ship rough lumber across state lines, Boise plainly had no intent to ship jumbo rolls to other states – a conclusion underscored by the testimony of Boise's corporate representative.

In summary, the movement of jumbo rolls from the base mill to the sheeter facility does not constitute the transportation of property in interstate commerce for purposes of the MCA exemption.

**B. Outbound Paper.**

The sheeter facility includes a sheeter yard and sheeter loading dock. Trailers that haul finished product are stored on the yard and are loaded at the loading dock. At least some of the plaintiffs drive a "yard truck" on the grounds of the sheeter facility in order to move trailers around the grounds. Some of the trailers that these plaintiffs move are loaded with finished product, which the defendant calls "outbound paper." The loaded trailers are destined to travel across state lines. At least some of the plaintiffs also use the yard truck to carry raw materials and waste product between Boise's three facilities and to refuel at a gas station. (Doc. 77 at 5-6).

The defendant concedes that no plaintiff uses the yard truck to move any loaded (or unloaded) trailer over any public road. However, the defendant says this is irrelevant because at least some of the plaintiffs have driven (and any plaintiff could be required to drive) the yard truck on Industrial Parkway for the other purposes noted above. (Doc. 77 at 23-24).

As noted, the MCA exemption extends only to employees "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service." 39 U.S.C. § 213(b)(1). That power "extends to those classes of employees and those only who … engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of … property in interstate … commerce …." 29 C.F.R. § 782.2(a). Only "the work of drivers, driver's helpers, loaders, and mechanics" meets this definition, and "no other classes of employees … perform duties directly affecting such safety of operation.'" *Id*. § 782.2(b)(1); *accord id*. §§ 782.2(b)(2), 782.2(d). A "yard hostler," who drives a hostler tractor "which he connect[s] to freight trailers in order to transport the trailers from a staging area to loading docks at the facility," does not perform the work of a driver, driver's helper, loader or mechanic and thus is not within the MCA exemption. *Billingslea v. Southern Freight, Inc*., 699 F.Supp. 2d 1369, 1371, 1376-79 (N.D. Ga. 2010).

On its previous motion for summary judgment, the defendant initially argued that the use of a yard truck to move trailers around the sheeter facility grounds satisfied the exemption but, in light of *Billingslea*, retreated in its reply brief. (Doc. 54 at 7 n.12). The defendant continues to acknowledge that *Billingslea* controls when an employee drives a yard truck only on private property, but it argues that *Wilson v. Notheis, Inc.*, 1999 U.S. Dist. Lexis 20493 (N.D. Ga. 1999), requires a different result when the employee drives a yard truck on a public road. At least under the circumstances here presented, the Court cannot agree.

The only activity that can trigger the exemption is activity satisfying all six of the following circumstances: (1) affecting the safety of operation; (2) of motor vehicles; (3) in the transportation; (4) on the public highways; (5) of property; (6) in interstate commerce. *Billingslea* establishes that the activity of the plaintiffs in driving a yard truck within the sheeter facility does not satisfy all six of these elements, especially the fourth.

Driving a yard truck between Boise's facilities or to a gas station implicates several of these elements, including the fourth, but it does not implicate the sixth. The raw materials and waste products that are transported on such trips plainly are not finished products beginning an interstate journey, and the defendant makes no argument to the contrary. Nor has the defendant argued or shown that refueling a yard truck (at least one that is not towing a loaded trailer) introduces an element of transportation in interstate commerce.

The defendant thus identifies two wholly separate types of activity undertaken with the yard truck, neither of which satisfies the test for the MCA exemption. What the defendant suggests is that the Court compensate for this deficiency by cobbling the two activities together so that, in combination, all six elements are implicated. For this remarkable proposition, the defendant relies exclusively on *Wilson*.

It is doubtful that *Wilson* supports the defendant's position. While *Wilson* involved yard tractors operated only on private property except for three-block forays for refueling, 1999 U.S. Dist. Lexis 20493 at *2, the Court did not rely on this latter fact in finding the MCA exemption applicable. Indeed, the *Wilson* Court did not address the "public highways" element of the exemption at all. Instead, the Court concluded, without analysis or explanation, that "a substantial part of Plaintiffs' activities consisted of moving trailers containing goods in the channels of interstate commerce to and from the Marshalls distribution center [all on private property], and … a substantial part of Plaintiffs' activities, as drivers of the hostler-tractors, affected the safety of the transportation of those goods." *Id*. at *8. It appears from this statement that the *Wilson* Court understood that it could rely on the interstate movement of the loaded trailers to satisfy the "public roads" requirement. The *Wilson* Court did so without engaging in the painstaking legal and factual analysis of the *Billingslea* Court, which reached the opposite conclusion, one with which the defendant has not quarreled.

12

Even if *Wilson* could be read as the defendant suggests, the Court would not follow it. Nothing in *Wilson* or in the defendant's presentation remotely explains or justifies the implausible proposition that, if an employee engages in two activities, neither of which triggers the MCA exemption, the employer can successfully invoke the exemption simply because, between them, the activities implicate all requirements for the exemption. Without authority or analysis demonstrating the logical and legal defensibility of such a principle, the Court will not embrace it.

## CONCLUSION

For the reasons set forth above, the plaintiff's motion for summary judgment as to the MCA exemption is **granted** and the defendant's motion **denied**. The MCA exemption does not apply in this case. This ruling governs all further proceedings in this action, including trial.

DONE and ORDERED this 31st day of December, 2013.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE